# THE JOSEPHINE B.[1]

## THE ARROW.

## WOODBURY v. THE JOSEPHINE B. AND THE ARROW.

## McALLISTER v. THE ARROW AND THE MAUD.

*(District Court, S. D. New York. April 7, 1891.)*

COLLISION—VESSELS MEETING IN HELL GATE—SIGNALS—SUPERVISORS' RULE 3.

A schooner in tow of the tug A. was going east through Hell Gate. As the tow rounded Hallett's point, it was gradually overtaken and passed by a large Sound steamer, which was near the south shore. Another tug was also in the neighborhood, near the north shore. In the vicinity of Negro point, the steam lighter J. B. was met. As the Sound steamer passed the A., she gave one whistle, to indicate to the A. that she was passing. This signal was answered by the A., and then by the lighter. No other signals were given by any of the vessels. The A. expected the lighter to go to the right. Instead, she attempted to pass between the tow and the Sound steamer, which she claimed was the only thing she could do under the circumstances. The lighter collided with the tow of the A. *Held*, that in that part of the river, dangerous from its windings, sunken rocks, and cross-currents, vessels must reasonably comply with the supervisors' rule which requires them to signal when approaching within half a mile of each other, to insure a common understanding. For their failure to so signal, both the lighter and the A. were held in fault.

In Admiralty. Cross-suits for damages caused by collision.

*Goodrich, Deady & Goodrich*, for the Maud.

*Hyland & Zabriskie*, for the Josephine B.

*Wilcox, Adams & Macklin*, for the Arrow.

BROWN, J. Between 3 and 4 o'clock in the afternoon of June 12, 1890, as the steam lighter Josephine B. was going westward past Negro point against a strong flood-tide, she came in collision with the schooner Maud, bound eastward in tow of the steam-tug Arrow upon a hawser about 225 feet long. The schooner and lighter both sustained damages, for which the above cross-libels are filed.

There is considerable difference in the testimony as to the precise point of collision. This is, perhaps, not to be wondered at, considering that all agree that the tide was running flood at the rate of from 5 to 7 knots, and that in such a current the boats in a very few moments after collision, when attention to the precise spot would be first given by most of the witnesses, would have been considerably changed. For this reason I think it probable that the place of collision was somewhat more to the westward than the witnesses for the Arrow suppose,—probably between Negro point and Pot cove. The Arrow went up with her tow between Hallett's point and Flood rock, going probably from 4 to 5 knots through the water, in addition to the speed of the current. As she was rounding Hallett's point to the eastward, a large Sound steamer, (the Northam,)

[1] Reported by Edward G. Benedict, Esq., of the New York bar.

about 350 feet long, overtook her, and gradually passed her on the starboard side at a distance variously estimated at from 75 to 150 feet. The lighter claims that, when she found the Arrow and the Northam ahead of her, she had no alternative but to attempt to pass between, the two, which she did, clearing the Arrow and the Northam, but running into the schooner behind, which had sagged somewhat to starboard of the Arrow's course. When the lighter passed between the Arrow and the Northam, the stern of the latter was about abreast of the stern of the tug. The lighter passed very near the quarter of the steamer, and, after doing so, starboarded her wheel, in order to clear the schooner; but the latter at that time, as the lighter claims, sheered towards her, and thwarted her endeavor to keep away. The master of the Northam testified that when coming up nearly abreast of the Arrow he gave her a signal of one whistle to indicate that he was passing, and that the Arrow should not crowd upon him; that the Arrow, and then the lighter, each answered with one whistle, and that no other signals were given by any of the vessels. The witnesses for the lighter confirm this statement, while the witnesses for the Arrow state that they heard no whistle from the other two vessels, but only one whistle from the Arrow, given when she was at a considerable distance from the lighter. The master of the Northam also testifies that when the whistle of the Arrow was given the lighter was to starboard of the course of the Arrow, and that it was impossible for her to cross the course of the Arrow to the northward, and that she had no alternative but to pass between them, as she did. The various witnesses for the Arrow contend that there was abundant room for the lighter to have kept to her right, i. e., to the northward of the Arrow, in accordance with the ordinary rule of the road; and that her course was so directed till shortly before the collision, when she sheered to the southward, crossing the Arrow's course in that direction without necessity, and attempting the dangerous passage between the Arrow and the Northam. The pilot of the Arrow admits that he could have shaped his course, when a considerable distance off, so as to go to the right along Hog's Back, but that he did not do so, because it was customary and necessary for tugs like the Arrow, when they had a tow on such a hawser, to go well over towards Hog's Back on the northerly side, to prevent the strong tide that sweeps over from that point towards Pot cove on the opposite shore from carrying such a tow upon the rocks on the Long Island side. Such a direction of the flood-current is admitted, as well as the necessity of going well across towards Hog's Back to avoid that danger. But it is nevertheless contended that this has not led to any change of the rule of going to the right as respects vessels meeting and passing in that vicinity, and that the lighter, in accordance with the general rule, ought to have gone to the right on the Ward's island side, as the tug Willie did, which was bound westward, only a few hundred feet astern of her.

There is a conflict of testimony, also, as respects the custom of taking vessels through Hell Gate in a strong flood upon a hawser. Several experts testify that such a method is unsafe, while an equal number tes-

tify that for a single large schooner it is quite as safe as towing alongside, and that the former is the practice in the majority of cases. As respects the rule of the road, the burden of proving any variation from the usual rule is upon those who assert it. I cannot say that they have sustained this burden by any preponderance of proof in their favor; and the absence in the supervising inspectors' rules of any provision changing the mode of meeting and passing, considering the fact that the inspectors have made special provisions in regard to overtaking vessels in that vicinity, is negative evidence of some weight against them. What seems remarkable, however, in the present case is that, though four vessels were navigating in the most difficult and dangerous waters in this whole vicinity, where a narrow channel, a swift tide, sunken rocks, a winding and cross-current, and rocky shores all combined to make navigation most difficult, and safe only by trained experts, not one of them complied with the rule that required them to give signals when approaching within a half mile of each other, to insure a common understanding for their common safety. In the pleadings, none of the parties have alleged this fault, perhaps because all were alike remiss. The pilot of the Willie (not a party) says he gave no whistle, because he was near the north shore, and intended to keep there, so that it was unnecessary. The Northam (also not a party) claimed to have been as near the south shore as was safe. But as respects the lighter and the Arrow, who, with reference to the other two boats, were towards the middle of the narrow channel, no possible excuse can be admitted for not giving timely signals, as required. A signal from the Arrow as soon as she had passed Hallett's point was specially important to the lighter, because the Arrow was expected to go over towards Hog's Back, and from there to swing unavoidably back again across the river, more or less, with the set of the current. For the same reason, a timely signal from the lighter was important to the Arrow. By their directions they were crossing, and it was of the utmost importance that a common understanding should be had as to the mode of passing. That the Arrow did not give any signal while approaching Hog's Back, nor till she had rounded to starboard, is certain from the fact that at the time when she gave her only whistle she says the lighter was on her port bow; and while approaching Hog's Back she certainly had the lighter on her starboard hand; and the signal given by the Arrow, heard by the pilot of the Northam and of the lighter, was when the vessels were within 500 feet of each other, and was too late to be of any use. The change of the lighter's position and heading, as testified to by the witnesses for the Arrow, whatever it may have been, was probably caused by the current alone. It is not credible that the lighter, when within 500 or 700 feet of the Arrow, and knowing the necessary set of the Arrow towards the southerly shore, would have voluntarily crossed the Arrow's bows, in order to run in between her and the Northam, if at that time the Arrow had already passed Hog's Back, and had the lighter on her port bow, with plenty of space to the northward.

In such a conflict of testimony the court is not called on to decide what, under such difficult circumstances, might or might not have been possibly done within the last few moments, or to treat any speculations of that kind as a substitute for the rule requiring timely signals, or as an excuse for not complying with that rule. If vessels are not to be held to an observance of that rule in situations like this, it might better be dropped altogether. It is a rule, however, of the highest utility. Had timely signals been given by either, and repeated, under rule 3, until a common understanding was had, no doubt this collision would have been avoided. The lighter and the Arrow were equally in fault in this respect, and they must therefore both be held liable.

As regards the propriety of taking a single schooner through Hell Gate by a hawser, the conflict between the experts is so great that, in the absence of any special regulations on the subject, I express no opinion. I have considerable doubt whether the schooner was managed in the best manner in the last few moments; but the appearance of the lighter coming through the narrow passage, not 400 feet distant, was so sudden and unexpected, the time, practically, was so brief, (probably not over 15 seconds,) and the danger was so obvious, that the schooner can hardly be held responsible. It was a case *in extremis*. Some sagging by her to starboard was unavoidable. This and the lighter's starboard wheel would explain the blow, even without any material sheer. I do not hold the schooner in fault.

Decrees may be entered in accordance herewith.